U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2012 NOV -7 AM 2: 13

CLERK
BY _____
    DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 5:12-cr-39 |
| ) | |
| LOUIS J. SOTERIOU ) | |

**OPINION AND ORDER DENYING
DEFENDANT'S MOTION TO SUPPRESS**
(Doc. 18)

This matter came before the court on October 3, 2012 for an evidentiary hearing on Defendant Louis Soteriou's motion to suppress statements. (Doc. 18.) Defendant is charged with nine counts of wire fraud in violation of 18 U.S.C. § 1343; five counts of mail fraud in violation of 18 U.S.C. § 1341; one count of conspiracy to commit mail fraud and wire fraud in violation of 18 U.S.C. § 1349; and three counts of money laundering in violation of 18 U.S.C. § 1957.

Defendant seeks suppression of all statements made to law enforcement officials on August 12, 2010 and March 8, 2012, arguing that he was subject to custodial interrogation without receiving *Miranda* warnings. The Government opposes the motion.

Defendant is represented by Assistant Federal Public Defender Steven L. Barth. The Government is represented by Assistant U.S. Attorney Michael P. Drescher.

**I.  Findings of Fact.**

In June 2010, Federal Bureau of Investigations ("FBI") Special Agent Daniel Rachek went to Defendant's residence. Defendant's sister informed Agent Rachek that Defendant did not reside there. Defendant contacted the New Hampshire office of the FBI to inform them that he did, in fact, reside at the location that Agent Rachek had visited, and he was willing to talk with the FBI agents.

In July 2010, Agent Rachek returned to Defendant's residence with an agent from the Vermont Department of Banking, Insurance, Securities and Health Care

Administration ("BISCHA") to interview Defendant. Initially, only Agent Rachek, Defendant, and the BISCHA agent were present. During the interview, Defendant's mother came home, but she was not in the room during the interview. At this point in the investigation, Agent Rachek had identified Defendant as a witness, and the purpose of the interview was to determine Defendant's involvement with Mac Parker and the film "Birth of Innocence." During this interview, Defendant was cooperative, responsive, and polite. Agent Rachek nonetheless believed that Defendant either had mental health issues or was lying because he made statements that did not sound logical, including claims that he was going to "pop," "transcend his body," and "travel in time." Defendant also mentioned purchasing a lottery ticket and traveling back in time to pay people back. In addition to these statements, Defendant engaged in certain acts that Agent Rachek described as peculiar, such as changing the tone of his voice, scratching, and telling agents that they had asked a "good question."

At the conclusion of the interview, Agent Rachek served Defendant with a grand jury subpoena commanding Defendant to appear in Burlington, Vermont on August 5, 2010 and told Defendant that he would be reimbursed for travel and hotel expenses. Agent Rachek asked Defendant to gather any documents that he had related to the investigation and bring this information with him to Burlington when he came to testify before the grand jury. Defendant indicated a willingness to cooperate with the subpoena, although he expressed some anxiety about travelling to Vermont. Agent Rachek subsequently contacted Defendant to discuss the logistics of Defendant's trip to Burlington and to notify him that there had been a delay in the grand jury until August 12, 2010. During this conversation, Defendant declined Agent Rachek's offer to pay for Defendant's hotel accommodations in Burlington.

On August 12, 2010, Defendant arrived at the federal building in Burlington, Vermont. Defendant appeared a little flustered and disheveled, and he told Agent Rachek that he had slept in his car the previous night. Agent Rachek brought Defendant to the United States Attorney's office. As was the customary practice, Defendant met with Assistant United States Attorneys Paul Van de Graaf and Michael Drescher, as well as

Agent Rachek and Internal Revenue Service Special Agent John Schroeder, prior to his anticipated grand jury appearance. Defendant was cooperative, responsive, and engaged. In the course of the August 12th interview, Defendant made unusual statements about transcending his body and being of another life form.

During the August 12th meeting, Defendant was allowed to take breaks on the hour every hour, including at least one break to leave the federal building to feed a parking meter. While Agent Rachek escorted Defendant around the United States Attorney's office during the breaks in accordance with the policy of that office, Defendant was not escorted when he left the building. No firearms were displayed and Defendant was not handcuffed or otherwise physically restrained at any time. The prosecutors and agents did not raise their voices or make any threats to Defendant. This interview lasted approximately four hours.

At the conclusion of the interview, Agent Schroeder asked about Defendant's laptop and requested consent to search it. The consent form indicated that Defendant "was advised of [his] right to refuse [consent] without court order." (Gov't Exhibit 1.) Defendant was also orally informed that he did not have to allow the search and that, without his consent, the agents could not search the computer without an order from a judge. Defendant executed and returned the written consent form. The prosecutors present at the meeting decided not to have Defendant testify before the grand jury because questions remained regarding the accuracy of Defendant's statements and his truthfulness. Defendant was not arrested after this meeting and returned home unescorted.

On March 8, 2012, Agent Rachek returned to Defendant's residence with Agent Schroeder. At the time of this interview, Defendant was a target of the investigation. Upon their arrival, Defendant greeted the agents, thanked them for making the trip down, and invited them into his home. Defendant, Agent Rachek, and Agent Schroeder sat at the dining room table for the interview. During the interview, Defendant's mother and sister came through the area where they were seated and went in and out of the kitchen preparing lunch. Agent Schroeder offered to leave and return after Defendant's mother

and sister were finished with their lunch, but Defendant told him that it was fine to continue.

The agents did not handcuff Defendant or otherwise physically restrain him, nor did they display their firearms. They did not threaten Defendant, express an intent to arrest him, or indicate an intent to serve another subpoena. Throughout the interview, Agent Rachek noted that Defendant was spitting into a cup because he claimed that he "had glue in his mouth." During this interview, the questioning of Defendant became more confrontational. The agents pointed out discrepancies between Defendant's version of events and other evidence, questioned Defendant's truthfulness, and questioned Defendant regarding his knowledge of the alleged fraud involved in the "Birth of Innocence" film project and whether Mr. Parker had solicited money for Defendant's benefit. The interview lasted approximately one to two hours. When the agents left Defendant's home, he followed them out of the house proclaiming his innocence and insisting that he had not engaged in a fraud or sham.

During one of the interviews, Defendant complained of a pain in his spine. Defendant had also made Agent Rachek aware that Defendant had suffered from a stroke and a heart attack. During the March 8, 2012 interview, Agent Rachek observed that Defendant may have been limping. However, there is no evidence that Defendant was physically incapacitated during the interviews or lacked the mental capacity to understand the nature of the questions and their relationship to the pending investigation. Defendant does not challenge his statements on voluntariness grounds.

## II. Conclusions of Law and Analysis.

Defendant seeks suppression of the statements that he made during the interviews on August 12, 2010 and March 8, 2012, arguing that each constituted a custodial interrogation in which Defendant was not warned of his *Miranda* rights. The Government concedes that the interviews constituted interrogation, and that Defendant was not given *Miranda* warnings, but responds that neither of the interviews was custodial in nature.

Under *Miranda*, a police officer may not question a suspect who has been taken "into custody" without first warning him that he:

> has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda v. Arizona*, 384 U.S. 436, 479 (1966). If no warning is given to a suspect who is in custody, the prosecution may not use statements obtained during the interrogation in its case in chief. *See United States v. Newton*, 369 F.3d 659, 668 (2d Cir. 2004).

This court has previously found that "[a] criminal defendant bears the burden of establishing that he or she was subjected to custodial interrogation." *United States v. Ramos*, 2012 WL 1854747, at *11 (D. Vt. May 21, 2012); *see also United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir. 1989) (affirming district court's dismissal of defendant's *Miranda* claim because defendant "failed to demonstrate that he was subjected to custodial interrogation[.]"); *United States v. Davis*, 792 F.2d 1299, 1309 (5th Cir. 1986) ("[Defendant] had the burden of proving that he was under arrest or in custody[.]"). The question of "whether a suspect is 'in custody' is an objective inquiry." *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2402 (2011). "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave[.]" *Id.* (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)).

In conducting the first inquiry, a court must "examine all of the circumstances surrounding the interrogation." *Id.* (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994)).

> Those circumstances include, inter alia, the interrogation's duration; its location (e.g., at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; whether officers told the suspect he was free to leave or under suspicion[.] . . . The circumstances also include, and especially so in border situations, the nature of the questions asked.

5

*United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011) (internal citations omitted).

With respect to the second inquiry, the Second Circuit has held that "[t]he free-to-leave inquiry constitutes a necessary, but not determinative, first step in establishing *Miranda* custody." *Newton*, 369 F.3d at 670. "The 'ultimate inquiry' for determining *Miranda* custody . . . [is] 'whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *Id.* (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam)).

### A. Whether Defendant Was in Custody During the August 12, 2010 Interview.

Defendant has proffered limited evidence to support his claim that he was in custody during the August 12, 2010 interview. He points out that he was legally compelled by subpoena to travel to Burlington, Vermont to testify before a grand jury. He also notes that he was questioned by law enforcement officers, which the subpoena did not require, and he was not warned that he did not have to speak with them or that he was free to leave. Finally, he notes that an agent escorted him around the United States Attorney's office.

The Supreme Court has found that persons are not deemed in custody simply because they are legally compelled to appear at a certain place and time. *See Minnesota v. Murphy*, 465 U.S. 420, 432-33 (1984) (finding probationer, who was directed to report to his probation officer in all matters or risk revocation of probation, was not subject to custodial interrogation requiring *Miranda* warnings when he met with probation officer and admitted to crimes). The Court has stated that *Miranda* warnings were not intended for grand jury testimony. *See id.* at 431 ("[W]e have never held that [*Miranda* warnings] must be given to grand jury witnesses[.]"); *United States v. Mandujano*, 425 U.S. 564, 580-81 (1976) (plurality opinion) (concluding that "[t]o extend these concepts [of *Miranda*] to questioning before a grand jury inquiry into criminal activity under the guidance of a judge is an extravagant expansion never remotely contemplated by this Court in *Miranda*."); *United States v. Weiss*, 752 F.2d 777, 786 (2d Cir. 1985) ("It is now well settled that a witness before a grand jury may not dismiss an indictment for perjury

because he was the target of an investigation, or because he was not advised of his *Miranda* rights[.]") (internal citation omitted); *United States v. Gillespie*, 773 F. Supp. 1154, 1162 (N.D. Ind. 1991) ("A witness before the grand jury, whether a target or not, is not 'in custody' under *Miranda*.").

Courts have reached the same conclusion with respect to pre-grand jury interviews, finding that such interviews do not generally constitute custody for purposes of *Miranda*. *See United States v. Bazemore*, 77 F. App'x 110, 112 (3d Cir. 2003) (refusing to suppress statements given during interview prior to grand jury testimony even though officers suspected defendant was involved in criminal activity, did not read him his *Miranda* rights, and did not indicate that he was free to leave at any time); *United States v. Micieli*, 594 F.2d 102, 105-06 (5th Cir. 1979) (finding a pre-grand jury interview was not a custodial interrogation); *United States v. Manos*, 1986 WL 13637, at *2 (N.D. Ill. Nov. 18, 1986) ("The fact that [defendant] had been subpoenaed by the grand jury did not convert this interview into a custodial interrogation."). Accordingly, the mere fact that Defendant's presence in Burlington was mandated by a subpoena does not necessitate a finding that he was in custody.

Although the Government did not affirmatively inform Defendant that he was free to leave, nobody "affirmatively convey[ed] the message that the defendant [was] not free to leave." *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992). "Decisions in [the Second Circuit] have emphasized that in the absence of actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is not free to leave." *Id.*; *see also United States v. Benedict*, 104 F. Supp. 2d 175, 179 (W.D.N.Y. 2000) ("Defendant's argument that no one told [him] that he was free to leave is specious. . . . [N]o one told him that he could not leave.").

Moreover, the agents did not use physical restraints, make threats, or display firearms during the course of the interview, and thus there was neither a show of force nor a threat of force. *See FNU LNU*, 653 F.3d at 155 (noting that officers never drew their weapons and did not use physical restraints when determining that suspect was not in custody); *United States v. Littledale*, 652 F.3d 698, 700-02 (7th Cir. 2011) (finding

7

suspect was not in custody when agents carried holstered weapons but did not draw them); *Newton*, 369 F.3d at 675 ("Handcuffs are generally recognized as a hallmark of a formal arrest."); *United States v. Filipowski*, 2009 WL 959949, at *3 (D. Vt. Apr. 3, 2009) (noting that the suspect was never placed in handcuffs when concluding that a reasonable person in his position would not consider himself subject to a formal arrest).

At no point during the interview did the agents or the prosecutors engage in any trickery or deception, and the tone of the interview was conversational. *See United States v. Guarno*, 819 F.2d 28, 31-32 (2d Cir. 1987) ("[W]e have held that 'in the absence of actual arrest something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so.'") (quoting *United States v. Hall*, 421 F.2d 540, 545 (2d Cir. 1969)); *see also United States v. Bassignani*, 575 F.3d 879, 884-85 (9th Cir. 2009) (finding no custodial interrogation where "nearly the entire two and a half hour interview was conducted in an open, friendly tone[,]" suspect "participated actively[,]" and "the questioning was not confrontational[.]").

Defendant's reliance upon the fact that he was escorted through the United States Attorney's Office, while relevant, does not render the interview custodial in nature. *See United States v. Ross*, 719 F.2d 615, 622 (2d Cir. 1983) ("The mere fact that [suspect] was told he would be accompanied by an IRS agent when he moved about the [place of interrogation] did not place him in custody within the meaning of *Miranda*[.]"). This conclusion is underscored by the further fact that he was also given multiple breaks during which he was free to leave the federal building unescorted. *Compare Filipowski*, 2009 WL 959949, at *3 (finding suspect was not in custody, the court noted that "[h]e remained free to take smoke breaks at the station unaccompanied by police") *and United States v. Groezinger*, 625 F. Supp. 2d 145, 158 (S.D.N.Y. 2009) (explaining that suspect's brewing coffee was "a privilege not usually bestowed upon a person under arrest[.]") *with Ramos*, 2012 WL 1854747, at *15 (noting that officer "made it clear to [suspect] that she was to remain behind in the cruiser" while he went to speak with the other passenger, "confirming that he was limiting [suspect's] freedom of movement.").

8

Finally, following the interview, Defendant was neither arrested nor threatened with arrest. This weighs heavily in favor of finding that the interrogation was not custodial. *See Guarno*, 819 F.2d at 32 (holding defendant was not subject to custodial interrogation, the court noted that he "was not placed under arrest" nor was he threatened "with arrest if he refused to cooperate"); *United States v. Lowen*, 647 F.3d 863, 868 (8th Cir. 2011) (noting that officers "did not arrest [defendant] upon the completion of the questioning[,]" the court found that he was not subject to custodial interrogation, even though defendant was never affirmatively informed that he was not under arrest); *United States v. Cunningham*, 2012 WL 369923, at *5 (D. Vt. Feb. 3, 2012) (pointing out that "[d]efendant was not arrested at the conclusion of the interview[,]" in support of the conclusion that defendant was not subjected to custodial interrogation).

Although Defendant made peculiar statements and engaged in unusual behaviors, he has not argued that his mental state made it more likely that he would not have felt free to leave. Moreover, even if Defendant personally did not feel he was free to leave, "[t]he *Miranda* custody inquiry is an objective test . . . designed to give clear guidance to the police." *Yarborough v. Alvarado*, 541 U.S. 652, 667 (2004). Therefore, police officers are not asked "to consider these contingent psychological factors when deciding when suspects should be advised of their *Miranda* rights." *Id.* at 669; *see also United States v. Mason*, 660 F. Supp. 2d 479, 485 (W.D.N.Y. 2009) (finding "testimony as to defendant's mental limitations is irrelevant to the question of whether defendant was 'in custody[.]'"); *United States v. Tudoran*, 476 F. Supp. 2d 205, 210 (N.D.N.Y. 2007) ("Because of the objective component, the test does not focus on the suspect himself, but rather on how a reasonable person in the suspect's shoes would perceive his circumstances.").

Examining the totality of the circumstances, the court concludes that Defendant has failed to establish that he was in custody during the August 12, 2010 interview. Therefore, he was not entitled to *Miranda* warnings and the court DENIES Defendant's motion to suppress the statements made in that interview.

## B. Whether Defendant Was in Custody During the March 8, 2012 Interview.

Defendant's argument that the March 8, 2012 interview constituted custodial interrogation is threefold. First, he asserts that the agents had previously made it clear that, if they wanted to speak to him and he refused, they could compel him to return to Burlington using a grand jury subpoena, as they had done on August 12, 2010. Second, Defendant claims that the agents knew that he was suffering from physical ailments, making travel difficult, and that he would, therefore, try to avoid a return to Burlington. And third, Defendant contends that at the time of the March 8th interview, his status had changed from witness to target of the investigation, rendering it more likely the interview was custodial in nature.

As previously noted, the court must consider the totality of the circumstances in determining whether Defendant was in custody. In this interview, Agents Rachek and Schroeder questioned Defendant in his home. "Lower courts . . . almost universally hold that questioning in a suspect's home is not custodial because individuals in a familiar environment are less likely to be intimidated by law enforcement officers." *United States v. Rakowski*, 714 F. Supp. 1324, 1334 (D. Vt. 1987); *see also Bassignani*, 575 F.3d at 885 ("We have held that an interrogation conducted in familiar surroundings weighs against a finding that the defendant was in custody."); *Mitchell*, 966 F.2d at 99 (explaining that "[t]he entire interview occurred in the familiar surroundings of [suspect's] home[,]" the court concluded that the suspect was not in custody); *Chanowitz v. Miller*, 2008 WL 2323388, at *9 (N.D.N.Y. June 2, 2008) ("[T]he incident took place in [suspect's] home, which strongly indicates that he was not in custody."); *but see Orozco v. Texas*, 394 U.S. 324, 327 (1969) (finding suspect in custody during interview at his home when he was awoken at four a.m. and questioned in his bedroom by four officers, and where officers testified that suspect was not free to leave and was under arrest). Furthermore, the agents offered to leave Defendant's home and come back at another time if it would be more convenient. *See United States v. Badmus*, 325 F.3d 133, 139 (2d Cir. 2003) (concluding that suspect was not in custody, the court noted "in particular [the district court's] finding

10

that the agents informed the defendant and his wife that they . . . could ask the agents to leave at any time[.]").

Also weighing in favor of finding the interrogation noncustodial, Defendant was not removed from his family. Defendant's mother and sister were present in the home and walked in and out of the room during the interrogation. *Compare Sprosty v. Buchler*, 79 F.3d 635, 641 (7th Cir. 1996) (citing "the presence of his mother and at least one family friend" as factors supporting a conclusion that suspect was not in custody) *and United States v. Hatathle*, 2008 WL 4642963, at *7 (D. Utah Oct. 17, 2008) (finding that defendant was not subject to custodial interrogation, the court noted that he "was not separated from his family") *and United States v. Ul Islam*, 2006 WL 1168015, at *4 (D. Conn. Apr. 28, 2006) (noting that suspect "was with his family at all times," the court concluded that he was not in custody) *with United States v. Revels*, 510 F.3d 1269, 1275 (10th Cir. 2007) (finding suspect was in custody, the court noted that "three male officers separated [suspect] from her boyfriend and two children") *and United States v. Griffin*, 922 F.2d 1343, 1352 (8th Cir. 1990) (concluding that suspect who had been isolated from his family was in custody, the court noted that "[a] frequently recurring example of police domination concerns the removal of the suspect from the presence of family, friends, or colleagues").

Although Defendant had become a target of the investigation at the time of this interview, the agents did not notify Defendant of this change in his status. "It is well settled . . . that a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question of whether the individual is in custody for purposes of *Miranda*." *Stansbury*, 511 U.S. at 324; *see also Berkemer v. McCarty*, 468 U.S. 420, 442 (1984) (concluding that defendant was not in custody despite officer's intent to arrest defendant as soon as he exited the car because the officer "never communicated his intention to [defendant,]" and "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time."); *FNU LNU*, 653 F.3d at 151 ("[T]he officer's subjective beliefs about whether the

interviewee was a suspect were irrelevant to the *Miranda* determination.") (citing *Stansbury*, 511 U.S. at 323-26).

Finally, as in the August 12, 2010 interview, Defendant was not restrained, the agents did not threaten to use force or restraint, the tone of the interview was not threatening, and Defendant was cooperative throughout. And, following the interview, the agents left without arresting Defendant.

In summary, the circumstances of the interview did not approximate the "incommunicado interrogation" in a "police-dominated atmosphere" at issue in *Miranda*. *Miranda*, 384 U.S. at 445. Defendant has failed to establish that during the March 8, 2012 interview his freedom of movement was restrained commensurate with a formal arrest. *Newton*, 369 F.3d at 670. The court must therefore DENY Defendant's motion to suppress the statements he made during this interview.

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress (Doc. 18) is DENIED.
SO ORDERED.

Dated at Rutland, in the District of Vermont, this 7th day of November, 2012.

Christina Reiss, Chief Judge
United States District Court